## SUPERIOR COURT OF BALTIMORE CITY.

Filed October 19, 1927.

HARRIET W. HOWARD AND CHARLES MORRIS HOWARD, PETITIONERS,
VS.
C. MORGAN MARSHALL, ET AL., MEMBERS OF THE BOARD OF ZONING APPEALS, AND JEFFERSON C. GRINNALDS, SECRETARY AND ENGINEER OF THE BOARD OF ZONING APPEALS.

*D. S. Randall, Walter H. Buck* and *Haman, Cook, Chesnut & Markell* for petitioners.

*Charles C. Wallace, Robert R. Carman* and *J. Purdon Wright* for defendants.

SOLTER, J.—

The petition in this case is filed for the purpose of having those of the defendants who constitute the Board of Zoning Appeals, and Jefferson C. Grinnalds, Secretary and Engineer of the Board of Zoning Appeals, hear and determine their appeal from the decision of the Buildings Engineer to issue a permit to a certain William Cook to use the property No. 1217 St. Paul street as an "undertaking business or establishment." The petitioners are the owners of the property 1205 St. Paul street, three doors south of No.

1217 St. Paul street, and they allege they were and are interested persons dissatisfied with the decision of the Buildings Engineer, and as such did properly file their appeal therefrom to the Board of Zoning Appeals. The petition shows that the permit was approved by the Mayor under Section 2 of Ordinance 825, and the petitioners are proceeding mainly under Sections 3 and 4 of the same ordinance. An answer has been filed by the defendants denying the jurisdiction of the Board of Zoning Appeals, to which a demurrer has been filed by the petitioners. William Cook, the person to whom the permit was issued, has filed his petition to be permitted to intervene. The plaintiffs have questioned his right by a demurrer to his petition. The pleadings, apart from the intervention petition, exact of the Court a determination of the question whether when a permit for one of the uses of the property, specifically enumerated in Section 2 of the ordinance, has received the approval of the Mayor as provided therein, such use must also be sanctioned by the Board of Zoning Appeals upon proper appeal to it, upon the allegation that such proposed use "because of the particular location of said land, buildings and structures and the nature of the proposed use, would create hazards of fire or disease, and would menace the public security, health or morals."

1.

It is conceded that Ordinance No. 825, the one in question, is a codification merely of three existing ordinances pertaining to changes in use of buildings or land; that they emanate from different historical sources and are all in force substantially as they were before codification. To understand their application to the facts of the present case, it is only necessary to consider their history while operating concurrently for the purpose of seeing how they stood with relation to each other during their process of change by repealing and re-enacting ordinances. A convenient starting point will be the time of the enactment of the First Zoning Ordinance, a residuum of which constitutes the third ordinance codified in Ordinance 825. As before stated, No. 825 is a codification of three existing ordinances which for convenience will be described herein as "Special Ordinance," "Mayor's Ordinance" and "Zoning Ordinance."

2.

The first Zoning Ordinance was enacted by the Council as No. 922 and was approved May 19, 1923. At this time the Special Ordinance and the Mayor's Ordinance were in effect. The Special Ordinance is a general ordinance which requires a permit by a special ordinance if a building is to be constructed, reconstructed, altered or repaired or used for certain specified purposes if the construction, alteration or repair thereof exceeds one quarter of the value of the building. Sixteen uses were specifically mentioned as requiring this Special Ordinance, and eleven of them were specifically incorporated in the First Zoning Ordinance as being prohibited in certain sections of the city (residence, first and second commercial). The uses found in both ordinances are manufacture of cotton wadding, explosives, refining of petroleum, rendering of fats and lard, hair factory, lime kiln, tannery, abattoir, glue factory, pulverizing charcoal and stock yards.

At the time of the passage of the First Zoning Ordinance there was also in existence the Mayor's Ordinance, which is Section 2 of the present No. 825 under consideration. In brief the Mayor's Ordinance provided that certain buildings would be limited as to location, and that no permit should be given by the Building Inspector (now Engineer) for the erection of any such buildings, nor should any building not already used for any of the enumerated purposes be converted or used for any such uses without the approval of the Mayor. At the time of the passage of the First Zoning Ordinance there were twenty-seven of which prohibited uses in the Mayor's Ordinance and in the First Ordinance seventeen were expressly excluded from certain sections of the city (chiefly residence, first and second commercial). Those specifically mentioned in both the Mayor's and the Zoning Ordinance are garages, blacksmith shops, junk shops, terra cotta manufacture, paint factory, candle factory, lumber yards, planing mills, iron mills, foundaries, breweries, distilleries, gas works, acid works, fertilizer factories and laundries. In other words, those uses herein mentioned required a Special Ordinance or approval by the Mayor, and were also prohibited as to certain sections of the city by the direct terms of the Zoning Ordinance. It might be well at this point to pause

and observe the interplay of these ordinances, but in order to continue the history of these ordinances this will be deferred.

The Zoning Ordinance in the case of Goldman vs. Crowther, 147 Md. 282, was declared unconstitutional and void as to the part thereof which attempted to regulate and restrict the use of property in Baltimore City, and the division of the city into districts among certain other provisions were stricken down. The second reason assigned by the Court for its action was as follows (p. 309), "because such deprivation is not justified by any consideration for the public welfare, security, health or morals apparent in the ordinance itself." The third reason was "because it does not require that the restrictions shall in fact be based upon any such consideration" and the Court added this thought, "But in reaching this conclusion we do not hold that the use of property in Baltimore City may not be regulated or restricted where such regulation or restriction is based upon such consideration." Acting unmistakably upon this reservation by the Court of Appeals, within six days after the decision the Second Zoning Ordinance was passed. A Third Zoning Ordinance later became necessary because of the decision in the First Tighe Case, 149 Md. 349, which later was upheld and now constitutes part of Ordinance 825 now under consideration. It is of importance to note that in the ordinance which attempted to express the idea of the Court of Appeals in the decision upon the First Zoning Ordinance there is substituted for the division of the city into districts and the specification of prohibited uses, the following general and comprehensive language, the effect of which is now before this Court, viz: "That (a) no building or structure of any kind, intended or designed to be used for any purpose, which because of its particular location, or the use to which such building or structure is intended to be put, would create hazards from fire or disease, or would menace the public security, health or morals shall be erected in the City of Baltimore. (b) No existing use of land, building or structure shall be changed to a use which because of the particular location of such land, building or structure, and or the nature of the proposed use, would create hazards from fire or disease would menace the public security,

health or morals." This provision thus set forth is contained in Section 3 of the Ordinance and deals with the requirements necessary to be fulfilled or the steps to be taken by the owner of the building or land in order to procure a permit for the erection of any building or structure or the change of an existing use of the same. These steps involve the making of the application, posting of the property, and require the Buildings Engineer to grant the permit unless the proposed use or changes of use would create hazards of fire or disease or would menace the public security, health or morals. It then provides certain facts which the Buildings Engineer and the Board of Zoning Appeals on appeals shall give consideration to in their determination of the effect of these uses.

To complete the history of the ordinance requiring a Special Ordinance requires merely the statement that it has not been changed since the time of the First Zoning Ordinance. The Mayor's Ordinance has likewise not been changed except as to the addition of several uses which include the one involved in this controversy, viz: "Undertaking businesses or establishments."

### 3.

In beginning the history of these ordinances with the passage of the First Zoning Ordinance, the purpose was to ascertain what would have been the effect of the duplication of "uses" in these ordinances, and to ascertain whether they were intended to be exclusive of each other, or whether intended to be supplementary or cumulative. Little difficulty exists as to the operation of the Special Ordinance upon the Zoning Ordinance. Let us assume a case where a general ordinance provides that before property may be improved for a certain use, f·r example, a glue factory, a special ordinance of the City Council must be obtained. Let us further assume the existence of a Zoning Ordinance which expressly prohibits the use of property within a certain portion of the city for a glue factory. It will be readily seen then when the Special Ordinance is passed pursuant to the general one it operates as a repeal pro tanto of any zoning ordinance. This is because both ordinances emanate from the same legislative authority or source. Suppose the first step of the applicant to be obtaining permission of the Zon-

ing Board; it avails him nothing as he still must obtain a special ordinance, which very ordinance when obtained will operate as a repeal of the zoning ordinance under which he obtained his permit. The conclusion is therefore obvious that the zoning ordinance must be subject to the Special Ordinance and the two cannot be considered together. The Special Ordinance provision is sui generis for while it is intended to operate as a check upon the City Engineer in the granting of permits for certain uses, it requires the property owner to obtain legislative action of equal dignity and effect with the general ordinance itself.

As to the Mayor's ordinance being in conflict with the original Zoning Ordinance, we may assume a situation where the particular use, for example, a foundry, is enumerated in both the Mayor's ordinance and is specifically prohibited in certain sections by the provisions of the Zoning Ordinance. Here there is no necessary conflict as in the previous case, although the Zoning Board and the Mayor each has the power of nullifying the action of the other. To grant to either exclusive power is to render void one of two ordinances of equal dignity and equally specific as to the prohibitions of the particular use. Where it is possible to read the two ordinances together this manifestly should be done, and it can only be done by making them supplementary.

As to the situation created by the Third Zoning Ordinance and the last amended Mayor's Ordinance, the latter of which specifies particularly the business of conducting an undertaking establishment, we have instead of the prohibited uses within districts, the general provision that no building which because of its particular location, or the use to which such building or structure is intended to be put, would create hazards from fire or disease, or would menace the public security, health or morals shall be erected in the City of Baltimore. The allegations of this mandamus petition as to this Cook property follow literally the wording of the ordinances. The further provision is in the ordinance that his question of the use being a menace to public security or not shall ultimately be passed upon by the Board of Zoning Appeals. We have the further fact that the Mayor acting under

this Mayor's Ordinance contained in Section 2 of the ordinance has approved the permit. It is also true that the Mayor acted pursuant to the police power, according to all the decisions of the Court of Appeals and likewise the Zoning Board when called upon to act will do so in the exercise of the police power.

As has been previously pointed out in the situation where the original Zoning Ordinance and the Mayor's Ordinance covered the same character of use, the only construction possible to be placed upon the two ordinances is that they are supplementary; it is further shown that the present Zoning Ordinance is a substitution of general terms for specific uses and it is further shown that the present ordinance is merely a codification of these two ordinances. When the consistent paralleling of these two ordinances has continued over this period of years, it would seem that whatever was the legislative intent with reference to the Mayor's Ordinance and the original Zoning Ordinance should likewise obtain with the present Mayor's and Zoning Ordinance, and would not fall under the general rule of statutory construction stated in Maertens vs. Moore, 108 Md. 636, and that these two ordinances are likewise supplementary and that therefore the application requires the action both of the Mayor and the Zoning Board.

It is objected that the effect of this construction would be to give the Zoning Board the power to nullify the action of the Mayor, should he in his discretion decide that the permit should be granted. This would be true as well if the Zoning Ordinance contained a specific prohibition against funeral parlors as heretofore shown. The application would require the favorable action of both the Mayor and the Zoning Board. It is further objected that as both act under the police power and both would be controlled by the same considerations, it cannot be contended that the legislative intent was to require this double supervision. This would seem to be a valid objection, but the legislative intent under the original Zoning Ordinance and the Mayor's Ordinance was to compel this double supervision. It is further objected that this construction is providing an appeal from the action of the Mayor in approving the permit, when as a matter of fact the Mayor's act is final and

complete in itself. The answer to this is that the Mayor's Ordinance is complete in itself, and likewise the Zoning Ordinance is complete in itself. There is in fact no appeal from either. The applications are separate and distinct and the final action of each is independent of the other and this is the inevitable result of the existence of two entirely separate and unrelated laws although they cover in a sense the same general subject matter. There is a further objection which seems the most serious and that is that under the Zoning Ordinance the Buildings Engineer acts as a Zoning Commissioner and it would appear that even after the Mayor has acted favorably upon a permit, the Building Engineer would have the right, acting as a Zoning Commissioner, to nullify the action of the Mayor, with the right of an appeal from this action to the Zoning Board of Appeals. Again in this connection we are forced back to the situation which would have arisen under the original Zoning Ordinance where this same procedure would have obtained. It seems inevitable that the construction of double supervision must be adopted or the rule in Maertens vs. Moore, supra, must control. To do this latter means that there would be a general scheme in use of supervision of uses by a Zoning Board protecting the city from locations which would prevent dangers from fire, disease or injury to the public morals expressed by ordinance in the most comprehensive terms possible to be used as a minimum requirement of safety, but there would be withdrawn from the operation of this ordinance certain enumerated uses to be dealt with solely by the Mayor under the Mayor's Ordinances. This might, of course, be sufficient in the wisdom of the Council, but it would be contrary to Section 6 of the present ordinance which is in reality an integral part of the present Zoning Ordinance. This Section reads "And be it further ordained that the ordinance shall be construed to be in addition to and not in substitution for any existing laws and ordinances in force in the City of Baltimore, except as herein expressly repealed."

As to the further question of the right of William Cook to intervene, while he is not a party against whom any relief is prayed he has nevertheless a material interest in the result of the proceeding and should be permitted to intervene. 18 R. C. L., p. 330, Section 278.

The demurrer to the application to intervene is overruled and the demurrer to the answer is sustained.